IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

UNITED STATES OF AMERICA           )
                             )
     v.                    )
                             )       CASE NO.
CHARLES MICHAEL KING,         )  5:21-CR-00009-LGW-BWC-9
                             )
           Defendant.       )

RULE 11 PROCEEDING
BEFORE THE HONORABLE LISA GODBEY WOOD
July 18, 2023; 10:06 a.m.
Waycross, Georgia

APPEARANCES:

For the Government:         TANIA D. GROOVER, Esq.
                         U. S. Attorney's Office
                         P. O. Box 8970
                         Savannah, Georgia  31412
                         (912) 201-2552
                         tania.groover@usdoj.gov

For the Defendant:          JACK DOWNIE, SR., Esq.
                         Downie Law, LLC
                         P. O. Box 926
                         Vidalia, Georgia  30475
                         (912) 537-9265
                         jack@downielaw.net

Reported by:               Debbie Gilbert, RPR, CCR
                         Official Court Reporter
                         801 Gloucester Street
                         Post Office Box 1894
                         Brunswick, GA 31521-1894
                         (912) 262-2608 or (912) 266-6006
                         debra_gilbert@gas.uscourts.gov
                          - - -

P R O C E E D I N G S

(Call to order at 10:06 a.m.)

1

2

3　　　　THE COURT:  Good morning.

4　　　　SPEAKERS:  Good morning.

5　　　　THE COURT:  Ms. Sharp, call the next case.

6　　　　THE CLERK:  United States of America versus Charles

7　King, Tania Groover for the Government, Jack Downie for Defense.

8　　　　MS. GROOVER:  United States is ready to proceed.

9　　　　MR. DOWNIE:  We're ready as well, Your Honor.

10　　　　THE COURT:  Mr. Downie, approach with your client, Mr.

11　Charles Michael King.

12　　　　Mr. King, we are here because the United States Attorney

13　and your own attorney say you want to change your plea from not

14　guilty to guilty to one of the counts that's pending against you

15　in this multi-count multi-defendant federal criminal indictment.

16　　　　THE DEFENDANT:  Yes, Your Honor.

17　　　　THE COURT:  The purpose of the hearing this morning is

18　for me to make sure you understand the case as it's presently

19　pending against you.  I want to make sure you understand all the

20　rights that you waive or give up if I decide to accept your

21　plea.  I also want to make sure there's, in fact, a factual

22　basis for plea of guilty to that one count and that this is

23　really what you want to do.

24　　　　There will be other things that we take up as we go

25　along.  I just want you to know right from the beginning this is

1  an important step in your life.  It's not something to take

2  lightly; understand?

3          THE DEFENDANT:  Yes, Your Honor.

4          THE COURT:  Also know in just a moment I'm going to have

5  you put under oath, sworn to tell the truth.  If you don't tell

6  the truth while under oath, the Government could prosecute you

7  for perjury; understand?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  Now, Mr. King, is anybody making you,

10  pushing you, leaning on you to come in here and change your

11  plea?

12          THE DEFENDANT:  No, Your Honor.

13          THE COURT:  This is how you wish to proceed?

14          THE DEFENDANT:  Yes, Your Honor.

15          THE COURT:  Swear in Mr. King.

16                      CHARLES MICHAEL KING,

17  having been first duly sworn, was examined and testified as

18  follows:

19          THE CLERK:  Thank you.  If you will please state your

20  full name and spell your last name.

21          THE DEFENDANT:  Charles Michael King, K-i-n-g.

22          THE COURT:  Mr. King, what are the last four digits in

23  your social security number?

24          THE DEFENDANT:  1837.

25          THE COURT:  How old are you?

1    THE DEFENDANT:  53.

2    THE COURT:  Are you married?

3    THE DEFENDANT:  Yes, ma'am.

4    THE COURT:  Do you have any children?

5    THE DEFENDANT:  Yes, ma'am.  Yes, Your Honor, sorry.

6    THE COURT:  How old are they?

7    THE DEFENDANT:  Stepchildren are 41, 33 and then 32 and

8    28 -- 29.

9    THE COURT:  So you have four children that are

10   stepchildren?

11   THE DEFENDANT:  Two that are step, the first two are

12   stepchildren.  The last two are my daughters.

13   THE COURT:  And four children altogether?

14   THE DEFENDANT:  Yes, ma'am.

15   THE COURT:  Where were you born?

16   THE DEFENDANT:  In Waycross.  I was adopted.

17   THE COURT:  All right.

18   THE DEFENDANT:  I think I was actually born in

19   Gainesville, Georgia.

20   THE COURT:  But you've lived in Waycross since you were

21   a baby?

22   THE DEFENDANT:  We moved several times, Your Honor, from

23   baby until 1984 I believe is when we moved back to Waycross.

24   THE COURT:  Where do you presently live?

25   THE DEFENDANT:  In Dixie Union, Georgia.

1  THE COURT:  What county is that?

2  THE DEFENDANT:  Ware.

3  THE COURT:  Tell me about your educational background.

4  How far did you go in school?

5  THE DEFENDANT:  I had a respiratory therapy

6  certification from Okefenokee Tech and that's, you know, after

7  graduation from high school.  That's it.

8  THE COURT:  And which high school did you graduate from?

9  THE DEFENDANT:  Ware County High School.

10  THE COURT:  What year was that?

11  THE DEFENDANT:  1987.

12  THE COURT:  Tell me about the work that you've

13  performed?  What jobs have you maintained?

14  THE DEFENDANT:  The last 23, 24 years was with CSX

15  Transportation.  I was a locomotive engineer.

16  THE COURT:  Have you ever been diagnosed with any mental

17  or physical disabilities?

18  THE DEFENDANT:  I have.  I was diagnosed with Meniere's

19  disease, which is vertigo.  I have degenerative disk disease.  I

20  guess pretty much it.

21  THE COURT:  Does the vertigo strike you periodically or

22  is it constant?

23  THE DEFENDANT:  It's periodically.

24  THE COURT:  Are you currently undergoing any episode of

25  that?

1          THE DEFENDANT:  No, ma'am.  No, Your Honor.

2          THE COURT:  And you have degenerative disk disease?

3          THE DEFENDANT:  Yes, ma'am.  Yes, Your Honor.

4          THE COURT:  Do you know what disk or disks that affects?

5          THE DEFENDANT:  C4, C5 and T7 and 8, I believe.

6          THE COURT:  I notice as you appear at the podium this

7    morning, you have crutches.  What occasions that?

8          THE DEFENDANT:  Yes, Your Honor.  Sunday was playing in

9    the pool with kids and all and slipped on the transition from

10   shallow to deep and leg went this way and knee went that way, so

11   I went yesterday and something is tore.  We don't know what yet.

12   I'm waiting to hear back to have an MRI done.

13         THE COURT:  Well, if during the hearing this morning, if

14   you need to sit down at some point, we can have a chair brought

15   over to the podium and the mike lowered so just let me know if

16   you need to do that at some point.

17         THE DEFENDANT:  Okay.

18         THE COURT:  Are you currently taking any medication?

19         THE DEFENDANT:  Yes, Your Honor.

20         THE COURT:  What are you taking currently?

21         THE DEFENDANT:  I take a 325 aspirin every day.

22   Protonics for acid reflux.  Adderall and Lexapro and

23   hydrocodone.

24         THE COURT:  The Adderall is prescribed for?

25         THE DEFENDANT:  ADHD.

1          THE COURT:  And the Lexapro?

2          THE DEFENDANT:  Anxiety, depression.

3          THE COURT:  And the hydrocodone?

4          THE DEFENDANT:  Pain.

5          THE COURT:  And is that occasioned by the knee accident

6    or did --

7          THE DEFENDANT:  From the degenerative disk.

8          THE COURT:  Do any of those prescription medications

9    either individually or in combination affect your ability to

10   interact with your attorney or guide the progress of your case

11   or understand what I'm saying this morning in any way?

12         THE DEFENDANT:  No, Your Honor.

13         THE COURT:  Mr. Downie, has that been your experience as

14   well?

15         MR. DOWNIE:  Your Honor, he seems a little more anxious

16   than normal, but I have no reason to question his ability to

17   understand what's going on.

18         THE COURT:  As far as participating in the case and

19   interacting with him and understanding your legal advice, have

20   you had any trouble in that respect?

21         MR. DOWNIE:  I have no concerns about that, Your Honor.

22         THE COURT:  In the last two days, have you had any drugs

23   or alcohol not prescribed by a physician?

24         THE DEFENDANT:  No, ma'am.

25         THE COURT:  Mr. King, as you stand before me right now,

1  you're presumed innocent.  What that means is the Government is

2  your accuser, and as such they have to prove that you're guilty

3  and they have got to do that by bringing forth proof of guilt

4  beyond a reasonable doubt.  You as the defendant don't have to

5  prove anything; understand?

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  Also know the indictment that was filed in

8  this case, the document that sets forth all the charges against

9  you and the other defendants, that's not evidence.  That's

10  simply what the grand jury and the US Attorney accuse you of

11  having done but it's not evidence; understand?

12          THE DEFENDANT:  Yes, Your Honor.

13          THE COURT:  Now, Mr. Downie, are you appointed or

14  retained?

15          MR. DOWNIE:  I was appointed, Your Honor.

16          THE COURT:  Mr. King, that means you've explained you

17  didn't have the kind of funds to pay an attorney to represent

18  you throughout this proceeding and throughout the case, and so

19  Mr. Downie was appointed to represent you at no charge to you;

20  is that correct?

21          THE DEFENDANT:  Yes, Your Honor.

22          THE COURT:  And I do want you to understand you have the

23  right to his representation at no charge to you throughout this

24  and every other phase of your case; understand?

25          THE DEFENDANT:  Yes, Your Honor.

1    THE COURT:  Also know you don't have to plead guilty.

2  If you want to persist in a plea of not guilty, you're entitled

3  to do that.  If you were to persist in a plea of not guilty,

4  you'd be entitled to a public and speedy trial by jury.  During

5  that jury trial a number of rights would belong to you.  The

6  presumption of innocence that we talked about, that would follow

7  you throughout the trial.

8    Your right to Mr. Downie's representation at no charge

9  to you would follow you throughout the trial.  You'd have the

10  right to see, hear, confront and cross-examine any witness the

11  Government might call.  You'd have the right to see all their

12  evidence.

13    For your own part, you'd have the right to put up

14  evidence if you wanted.  You'd have the right to call witnesses

15  and use subpoenas from the court to make them appear.  You'd

16  have the right to take the stand and testify, subject yourself

17  to cross-examination by the US Attorney, but you'd also have the

18  right to go to trial and remain silent, and if you elected to

19  proceed in that fashion, nobody could say anything negative in

20  front of the jury about your silence.  It is after all a

21  constitutional right; understand?

22    THE DEFENDANT:  Yes, Your Honor.

23    THE COURT:  Do you understand that if you plead guilty

24  and I decide to accept your plea, you will have waived, that is,

25  given up all the rights associated with a trial by jury.  In

1  fact, there will be no trial of any kind.  Essentially what will

2  remain of your case is the sentencing phase; understand?

3        THE DEFENDANT:  Yes, Your Honor.

4        THE COURT:  Do you have any questions about the waiver

5  of those rights?

6        THE DEFENDANT:  No, Your Honor.

7        THE COURT:  Well, have you and Mr. Downie had the

8  opportunity to talk about the facts and the law as they pertain

9  to your case?

10        THE DEFENDANT:  Yes, Your Honor.

11        THE COURT:  Has he gone over with you the plea agreement

12  you're proposing?

13        THE DEFENDANT:  Yes, Your Honor.

14        THE COURT:  Has he gone over with you the indictment

15  that was filed?

16        THE DEFENDANT:  Yes, Your Honor.

17        THE COURT:  Has he spoken with you at least in general

18  terms about the federal sentencing guidelines?

19        THE DEFENDANT:  Yes, Your Honor.

20        THE COURT:  Are you satisfied with his representation?

21        THE DEFENDANT:  Yes, Your Honor.

22        THE COURT:  Do you have any complaints about it

23  whatsoever?

24        THE DEFENDANT:  No, Your Honor.

25        THE COURT:  Although I understand that you and Mr.

1   Downie have gone over the indictment together, it is my

2   obligation to cover it with you as a part of this proceeding.

3   You are charged in Counts 1, 8 and 53.

4        It's my understanding that you're here offering to plead

5   guilty only to Count 1.  We will start there.  Count 1 alleges

6   that you and other individuals were members and associates of a

7   transnational criminal organization called the Patricio TCO

8   whose members and associates engaged in mail fraud,

9   international forced labor trafficking and money laundering

10  among other crimes, it alleges, within the Southern District of

11  Georgia, Middle District of Georgia, Northern District of

12  Georgia, Middle District of Florida, Southern District of Texas,

13  Mexico, Guatemala, Honduras and elsewhere.

14        It alleges that the purpose of that Patricio TCO was to

15  make money from illegal activities including mail fraud, forced

16  labor and money laundering.

17        It alleges that that TCO, that is transnational crime

18  organization, fraudulently used the H-2A visa program to smuggle

19  foreign nationals from Mexico, Guatemala and Honduras into the

20  United States under the pretext of being agricultural workers.

21        The organization further sought to make money by

22  exploiting those foreign workers and then laundering the illegal

23  proceeds.

24        The indictment alleges that you are a United States

25  citizen and owner of Kings Berry Farms and the registered agent

of Hilltop Packing, LLC.  It alleges that you had foreign
workers who entered the United States on an H-2A visa working on
your farms.

It alleges that Defendants Maria Leticia Patricio and
Daniel Mendoza filed fraudulent petitions for you.  It alleges
that you were an associate of another defendant named Stanley
Neal McGauley.

Count 1 goes on to allege a violation of 18 USC Section
1349, that is, conspiracy to commit mail fraud.  It states that
beginning at a time unknown to the grand jury but at least from
about 2015 up through the return of the indictment in Atkinson,
Bacon, Coffee, Tattnall, Toombs and Ware Counties within the
United States and elsewhere you and others knowingly and
willfully conspired to commit mail fraud, that is, to execute
and attempt to execute a scheme and artifice to defraud and to
obtain money by means of materially false and fraudulent
pretenses, representations and promises by using the mail for
the purpose of executing that scheme and artifice in violation
of 18 USC Section 1341.

Count 1 goes on to detail the object of the conspiracy
and set forth various means and manners through which the
conspiracy was put forward.  It also details certain overt acts
it alleges were taken in furtherance of the conspiracy,
including an allegation that on or about August 8th, 2018
members of the Patricia TCO aided and abetted by you mailed

1  Petition WAC1825351049 to the United States Government.  It

2  alleges that that petition sought 300 foreign workers to enter

3  the United States under the H-2A visit program.  It alleges that

4  as a result on approximately September 14th, 2018, among other

5  foreign nationals, an individual identified as Victim Number 12

6  entered the United States to work for the Patricia TCO.

7         It alleges further that on or about December 10th, 2019

8  Defendant Daniel Mendoza, Stanley McGauley and you, aided and

9  abetted by others, mailed Petition WAC2005850609 to the United

10  States Government and that that petition sought 74 foreign

11  workers to enter the United States under that visa program and

12  that, as a result, on March 1st, 2020, among other foreign

13  nationals, individuals identified as Victims 2, 8, 9, 10, 13,

14  and 14 entered the United States to work for the Patricio TCO.

15         And my question to you is simply:  Do you understand

16  that's what's set forth against you in Count 1?

17         THE DEFENDANT:  Yes, Your Honor.

18         THE COURT:  Also named in Count 8, which alleges

19  conspiracy to engage in forced labor in violation of 18 USC

20  Section 1594(b) and you're named in Count 53, which alleges

21  money-laundering conspiracy in violation of 18 USC Section

22  1956(h).  I understand you are not offering to plead guilty to

23  Counts 8 and 53.

24         Now, in order for you to be found guilty of Count 1, the

25  conspiracy to commit mail fraud, the Government would have to

1  prove beyond a reasonable doubt what are called the essential

2  elements of that offense and the essential elements of that

3  particular offense are two-fold, so the Government would have to

4  prove beyond a reasonable doubt first that two or more people in

5  some way agreed to try to accomplish a common and unlawful plan

6  to commit mail fraud as charged in the indictment and, second,

7  that you knew the unlawful purpose of the plan and willfully

8  joined in it.

9        Do you understand those are the essential elements of

10  Count 1?

11        THE DEFENDANT:  Yes, Your Honor.

12        THE COURT:  Do you understand that by pleading guilty

13  you admit that they are satisfied?

14        THE DEFENDANT:  Yes, Your Honor.

15        THE COURT:  Now, the maximum possible penalty that could

16  ever be imposed for Count 1 is imprisonment of not more than 20

17  years, a fine of not more than $250,000.00, a term of supervised

18  release of not more than three years, a $100.00 special

19  assessment and restitution could be ordered to the victims.  Do

20  you understand those are the maximum possible penalties that

21  could be imposed?

22        THE DEFENDANT:  Yes, Your Honor.

23        THE COURT:  A couple of followup concepts regarding

24  punishment.  That phrase "supervised release" means after any

25  period of federal incarceration, once someone is released from

1    prison, they have to follow the rules that I set forth for a

2    given number of years.  Those rules may include but not be

3    limited to a requirement that you get a job, that you not

4    violate any law.  You may be subject to certain searches.

5         If you were to fail to live up to the terms of

6    supervised release, you could wind up back in prison;

7    understand?

8         THE DEFENDANT:  Yes, Your Honor.

9         THE COURT:  I also want you to be familiar with those

10   sentencing guidelines I mentioned.  They are not mandatory.

11   They are advisory but it's still my duty to calculate what that

12   advisory guideline range is going to be in your case and to

13   consider that range along with possible departures under the

14   guidelines themselves and then to also consider all the

15   sentencing factors that are set forth in our federal sentencing

16   statute, 18 USC Section 3553.

17        Once I consider all those things, it's going to result

18   in me imposing a punishment on you that's either within that

19   advisory guideline range, it could be above it, it could be

20   below it.

21        Now some of the major factors that go into figuring all

22   that out are your criminal history or lack thereof, your role in

23   the offense, what it was you did, and whether you came here and

24   told the truth and accepted responsibility for your actions.

25   Those are some of the major factors that go into it.  There's

1 others.  Do you understand all of that?

2 THE DEFENDANT:  Yes, Your Honor.

3 THE COURT:  Do you have any questions about any of it?

4 THE DEFENDANT:  No, Your Honor.

5 THE COURT:  Has anybody promised you an exact sentence?

6 THE DEFENDANT:  No, Your Honor.

7 THE COURT:  That's good.  At this point all they can do

8 is give you their best guess, and their guess wouldn't be

9 binding on me as your sentencing judge; understand?

10 THE DEFENDANT:  Yes, Your Honor.

11 THE COURT:  Well, in representing you, Mr. Downie has

12 apparently negotiated with the US Attorney's Office trying to

13 reach a plea agreement in your case.  Did he have your

14 permission to do that?

15 THE DEFENDANT:  Yes, Your Honor.

16 THE COURT:  We will take that agreement up.  Ms.

17 Groover, if you will stand and summarize its provisions.

18 MS. GROOVER:  Yes, thank you, Your Honor.

19 We have reached a plea agreement in this case for calls

20 for Mr. King pleading guilty to Count 1 of the indictment.  At

21 sentencing, the Government will move to dismiss any other counts

22 of the indictment that remain pending against Mr. King.

23 If The Court determines the defendant qualifies for

24 adjustments under Section 3E1.1(a) of the sentencing guidelines

25 and the offense level prior to that adjustment is 16 or greater,

1    the Government will move for an additional one-level reduction

2    in offense level.

3          The defendant agrees to pay restitution for the full

4    loss caused by his total criminal conduct, which is not limited

5    to the specific counts to which he's pleading guilty.  He agrees

6    to forfeiture as outlined in the plea agreement.

7          He agrees that he will be debarred from receiving a

8    temporary labor certification from the Department of Labor under

9    the H-2A program for a period of three years as outlined in the

10   plea agreement.

11         He waives all rights concerning appeal provisions

12   applicable to the debarment and disqualification from filing any

13   H-2A labor certification application.

14         Defendant agrees to provide full, complete, candid and

15   truthful cooperation to the Government, and the Government in

16   its sole discretion will decide whether that cooperation

17   qualifies as substantial assistance that warrants the filing of

18   a motion for a downward departure or reduction in sentence.

19         Your Honor, I am intentionally skipping one section at

20   this moment.

21         The defendant does waive all rights to appeal on any

22   ground with only three exceptions.  He may appeal his sentence

23   if a sentence exceeds the statutory maximum, that sentence

24   exceeds the advisory guideline range as determined by The Court

25   at sentencing or the Government appeals, and by signing this

1    plea agreement, he explicitly instructs his attorney not to file

2    an appeal unless one of the three exceptions is met.

3         He also waives his right to collaterally attack his

4    conviction and sentence on any ground and any method including

5    but not limited to a Title 28 United States Code Section 2255

6    motion, the only exception being that he may collaterally attack

7    his conviction and sentence based on a claim of ineffective

8    assistance of counsel.

9         He also waives all rights to request information about

10   the investigation and prosecution of his case under the Freedom

11   of Information Act or Privacy Act.

12        And he also waives the protections of the Rule 11(f) of

13   the Federal Rules of Criminal Procedure and Rule 410 of the

14   Federal Rules of Evidence.  And if he fails to plead guilty or

15   later withdraws his guilty plea all statements made by him shall

16   be admissible -- in connection with that plea shall be

17   admissible for any purposes.

18        Your Honor, there is an additional section in this

19   proposed plea agreement that the United States has moved to seal

20   and with your permission like to approach and place it on the

21   record at sidebar.

22        THE COURT:  Counsel, if you will approach for a brief

23   sidebar to address that motion.  Mr. Downie, I will leave it for

24   Mr. King to join us.  If not, we will assume that you have

25   voluntarily given up that ability.

1  (This portion of the hearing was sealed by order of The

2  Court.)

3  THE COURT:  Mr. Downie, is that summary consistent with

4  the agreement you negotiated?

5  MR. DOWNIE:  It is, Your Honor.

6  THE COURT:  And Mr. King, is that summary consistent

7  with the agreement that you signed?

8  THE DEFENDANT:  Yes, Your Honor.

9  THE COURT:  And did you read it before you signed it?

10  THE DEFENDANT:  Yes, Your Honor.

11  THE COURT:  Other than any provision contained in that

12  plea agreement, has anybody made you any promises regarding the

13  outcome of your case?

14  THE DEFENDANT:  No, Your Honor.

15  THE COURT:  Ms. Groover, do you want to tender the

16  signed agreement and confirm the signatures?

17  MS. GROOVER:  Yes, Your Honor.  Thank you.

18  THE COURT:  Proceed.

19  MS. GROOVER:  Page 11 of the plea agreement bears my

20  signature on behalf of the United States.  May I approach, Your

21  Honor?

22  THE COURT:  Yes, thank you.

23  MS. GROOVER:  Mr. Downie, is this your signature on Page

24  11 of the plea agreement?

25  MR. DOWNIE:  Yes, ma'am.

1    MS. GROOVER:  Mr. King, is this your signature on Page

2  11 of the plea agreement?

3    THE DEFENDANT:  Yes, ma'am.

4    MS. GROOVER:  This is the plea agreement that we have

5  reached that we submit to you for consideration.

6    THE COURT:  Thank you.  Let me follow up on three of the

7  points that Ms. Groover made.  First of all, contained in the

8  plea agreement you're proposing is a waiver of certain appeal

9  rights.  It states, "Defendant entirely waives his right to a

10  direct appeal of his conviction and sentence on any ground."

11  Now, there are three exceptions to that waiver.  That means if

12  but only if one of these three things were to occur would you

13  get a direct appeal pursuant to this agreement.

14    Number 1, if I sentenced you above that statutory

15  maximum, you could appeal that directly; Number 2, if I were to

16  sentence you above the advisory guideline range as found by me,

17  you could appeal that directly; or Number 3, if the Government

18  were to file a direct appeal, then you could file one as well.

19  Otherwise, pursuant to this plea agreement you waive all other

20  direct appeal rights; understand?

21    THE DEFENDANT:  Yes, Your Honor.

22    THE COURT:  Any questions about that waiver?

23    THE DEFENDANT:  No, Your Honor.

24    THE COURT:  Also contained in the agreement is a waiver

25  of certain collateral attack rights.  It states, "Defendant

1  entirely waives his right to collaterally attack his conviction

2  and sentence on any ground and by any method including but not

3  limited to a 28 USC Section 2255 motion."

4       Now, there is one exception to that waiver, and that is

5  pursuant to this agreement, you retain the right to collaterally

6  attack based on a claim of ineffective assistance of counsel.

7  But otherwise, pursuant to this plea agreement, you waive all

8  other collateral attack rights; understand?

9       THE DEFENDANT:  Yes, Your Honor.

10      THE COURT:  Any questions about that waiver?

11      THE DEFENDANT:  No, Your Honor.

12      THE COURT:  Also contained in the agreement is what's

13  called a debarment provision.  It states that pursuant to the

14  agreement you and any successor in interest to you will be

15  debarred from receiving a temporary labor certification from the

16  Department of Labor under the H-2A program for a period of three

17  years commencing at the end of the 30-day period immediately

18  following your date of sentencing.  Do you understand?

19      THE DEFENDANT:  Yes, Your Honor.

20      THE COURT:  Any questions about that debarment

21  provision?

22      THE DEFENDANT:  No, Your Honor.

23      THE COURT:  Finally, contained in the agreement is a

24  forfeiture provision through which the United States seeks

25  forfeiture of property constituting or derived from the crimes

1 alleged to have occurred in the indictment. It specifically

2 seeks forfeiture of a United Community Bank official check

3 number in the amount of $1,788.09. Do you understand that there

4 is a forfeiture provision in this agreement?

5       THE DEFENDANT: Yes, Your Honor.

6       THE COURT: Well, Mr. Downie, as an officer of The

7 Court, are you aware of any impropriety on the part of the

8 United States in handling Mr. King's case?

9       MR. DOWNIE: I'm not, Your Honor.

10       THE COURT: And Ms. Groover, are you aware of any

11 impropriety on anyone's part in handling this case?

12       MS. GROOVER: No, Your Honor.

13       THE COURT: Well, Mr. King, do you still want to plead

14 guilty to Count 1?

15       THE DEFENDANT: Yes, Your Honor.

16       THE COURT: Do you want to plead guilty to Count 1

17 because you are, in fact, guilty of it?

18       THE DEFENDANT: Yes, Your Honor.

19       THE COURT: You understand the rights and the privileges

20 that you waive or give up if I accept your plea?

21       THE DEFENDANT: Yes, Your Honor.

22       THE COURT: Let the record reflect that Mr. Charles

23 Michael King is 53 years old. He's married and has four adult

24 children. He was adopted as a baby but believes he was born in

25 Gainesville, Georgia. He currently lives in Ware County. He

graduated from high school and went on to obtain certifications
to be a respiratory therapist.  He's spent the bulk of his
career with CSX as a locomotive engineer.  He does suffer from
vertigo or Meniere's disease periodically.  He has degenerative
disk disease and recently injured his knee.

He takes some over-the-counter medications as well as
Adderall for ADHD and Lexapro for anxiety and hydrocodone for
pain.

I've watched him as he's interacted with me in court
this morning.  It's obvious he's in full possession of all his
faculties.  He's participated intelligently.  He's had the
services of an excellent defense lawyer who has gone over all
the requisite pleadings and concepts with him.

In short, I find that Mr. King's offer to plead guilty
to Count 1 is knowing.  I also find that it's voluntary; is that
correct, Mr. King?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Therefore, I will approve of the plea
agreement.  Let me call on Ms. Groover for a factual basis and
you two may have a seat while she does so.

MR. DOWNIE:  Thank you, Your Honor.

MS. GROOVER:  Thank you, Your Honor.  The United States
calls Israel Borup to the stand.

ISRAEL BORUP,
having been first duly sworn, was examined and testified as

1    follows:

2         THE CLERK:  Thank you.  You may be seated.  And if you

3    will please state your full name and spell your last, state your

4    occupation and your business address.

5         THE WITNESS:  My name is Israel Bravo Borup.  My last

6    name is B as in boy O-R-U-P as in Paul.  I'm employed as a

7    criminal investigator with Homeland Security Investigations.

8    Our address is 2 East Bryan Street, Suite 800, Savannah,

9    Georgia.

10                            EXAMINATION

11   BY MS. GROOVER:

12   Q.    How long have you been employed with Homeland Security?

13   A.    Since December of 2017 so five, almost six years.

14   Q.    You're a special agent, sir?

15   A.    Yes.

16   Q.    What are some of your duties?

17   A.    I investigate federal violations, any contraband entering

18   or leaving the United States, any violations such as human or

19   labor trafficking.

20   Q.    Are you one of the lead case agents in this case

21   investigation?

22   A.    Yes.

23   Q.    And is this investigation into an organization believed to

24   be committing human smuggling, human trafficking and visa fraud

25   that was primarily operating here in the Southern District of

1    Georgia with ties throughout the United States, Mexico and

2    Honduras?

3    A.    Yes.

4    Q.    And since as early as 2016, has Homeland Security as well

5    as the United States Department of Labor, United States State

6    Department as well as the United States Postal Inspection

7    Service and the FBI been investigating this organization for

8    fraudulently using the H-2A visa program to bring in foreign

9    nationals into the United States to be an H-2A worker?

10   A.    Yes.

11   Q.    Are you familiar with the H-2A process in general, sir?

12   A.    Yes.

13   Q.    In the lawful program?

14   A.    Yes.

15   Q.    And in general, do foreign nationals, they cannot work in

16   the United States unless they have an employer that sponsors

17   them from the United States Government; is that correct?

18   A.    Yes.

19   Q.    And can foreign nationals obtain that authorization and

20   that sponsor by filing, getting a petition filed with the United

21   States Government?

22   A.    Yes.

23   Q.    And is that, does that petition then authorize foreign

24   nationals to enter on a visa called an H-2A visa; is that

25   correct?

1  A.    Yes.

2  Q.    Does that visa limit -- allow foreign nationals -- limited

3  their work to perform certain agricultural work?

4  A.    Yes.

5  Q.    And is that work directly tied to the petition that

6  authorized the foreign worker to enter the United States?

7  A.    Yes.

8  Q.    And under the terms of the lawful H-2A program, are

9  foreign nationals allowed to work at any location or do they

10  have to work at the specific location tied to the petition?

11  A.    At the specific location tied to the petition.

12  Q.    And can foreign workers who enter on a H-2A visa, can they

13  stay at any approved location or do they have to stay at the

14  location tied to the petition?

15  A.    It has to be the location on the petition.

16  Q.    And under the lawful H-2A program, can individuals who are

17  sponsoring workers charge the workers a fee for the right to get

18  a visa and come to the United States?

19  A.    No.

20  Q.    And are they allowed to charge them for their housing or

21  their transportation?

22  A.    No.

23  Q.    And under the terms, the lawful terms of the H-2A program,

24  do people have to pay the H-2A workers pursuant to the terms of

25  the contract?

1  A.    Yes.

2  Q.    Which is normally 10 or 11 dollars per hour; is that

3  correct?

4  A.    Yes.

5  Q.    Did your investigation include, among other things,

6  reviewing documents submitted to the United States Government to

7  bring in foreign workers on the H-2A visas?

8  A.    Yes.

9  Q.    As well as obtaining and reviewing e-mail records and bank

10  records associated with the petition submitted to bring in

11  foreign workers?

12  A.    Yes.

13  Q.    Did the investigation include interviewing cooperating

14  sources?

15  A.    Yes.

16  Q.    Did it include various undercover operations?

17  A.    Yes.

18  Q.    Did it also include interviewing the victims who have

19  entered into the United States on the H-2A visa?

20  A.    Yes.

21  Q.    Did the investigation also obtain records and devices

22  obtained from federal search warrants including over 250

23  electronic devices such as cell phones and computers?

24  A.    Yes.

25  Q.    And did the investigation also include a review of

1  documents obtained from third-party businesses such as car

2  dealerships and casinos?

3  A.    Yes.

4  Q.    Did the investigation include obtaining tracking data from

5  federal tracking search warrants that were placed on vehicles?

6  A.    Yes.

7  Q.    Did it also include multiple federal wiretaps on multiple

8  telephone numbers?

9  A.    Yes.

10  Q.    And did the entire investigation reveal that this

11  organization was involved in the criminal activity as outlined

12  in the indictment?

13  A.    Yes.

14  Q.    And specifically did the investigation reveal that this

15  organization unlawfully charged foreign workers a fee or a

16  smuggling debt to obtain an H-2A visa?

17  A.    Yes.

18  Q.    And once inside the United States, did members of the

19  organization, did they actually pay them pursuant to the terms

20  of the contract?

21  A.    No.

22  Q.    And did they move them to various unapproved locations?

23  A.    Yes.

24  Q.    And did they hold some of the workers' identification

25  documents such as their visas and their passports to pre --

1    until they paid off a fee or smuggling debt?

2    A.    Yes.

3    Q.    Did members of this organization also charge people extra

4    money just to come into the United States, not work at all and

5    just abscond?

6    A.    Yes.

7    Q.    And did the entire investigation reveal that from at least

8    2015 and continuing through approximately October of 2021 this

9    organization mailed dozens of false petitions to the United

10   States Government seeking over 71,000 foreign workers to enter

11   the United States to work for agricultural employers and then

12   fraudulently cause the United States to issue thousands of H-2A

13   visas to foreign nationals?

14   A.    Yes.

15   Q.    Did the investigation reveal that the purpose of all this

16   was to exploit and to cheat the system for financial gain?

17   A.    Yes.

18   Q.    Did the organization exploit the foreign workers by

19   demanding that they pay the unlawful fees?

20   A.    Yes.

21   Q.    And by holding their identification documents?

22   A.    Yes.

23   Q.    And demanding that they perform the work with little to no

24   pay?

25   A.    Yes.

1  Q.   And sometimes work and inappropriate housing conditions

2  that were crowded and unsanitary and degrading?

3  A.   Yes.

4  Q.   And were some of the workers threatened with violence and

5  deportation?

6  A.   Yes.

7  Q.   Based on the entire investigation, did the investigation

8  reveal the organization profited millions of dollars from this

9  scheme?

10  A.   Yes.

11  Q.   And did they do that by smuggling bulk cash into the

12  United States from the workers?

13  A.   Yes.

14  Q.   As well as -- and then taking the money made from this

15  scheme, did they purchase vehicles, land and houses and a bar

16  with cash?

17  A.   Yes.

18  Q.   And did the organization also launder some of the money

19  through casinos?

20  A.   Yes.

21  Q.   Now specifically turning to Mr. Charles King, did the

22  investigation reveal that Mr. King was involved in this scheme

23  with his business partner and codefendant Mr. Stanley Neal

24  McGauley?

25  A.   Yes.

1  Q.   Did the investigation reveal that they mailed or caused to

2  be mailed false petitions to the United States to bring in more

3  H-2A workers than necessary for their farms?

4  A.   Yes.

5  Q.   And did they do this all to make money?

6  A.   Yes.

7  Q.   Did the investigation reveal that Mr. King submitted

8  multiple petitions with fraudulent information?

9  A.   Yes.

10 Q.   Did the investigation reveal that the United States

11 refused at least 430 visas that were associated with Mr. King's

12 petitions because of inaccurate or incomplete information?

13 A.   Yes.

14 Q.   Was Mr. King the owner of Kings Berry Farm, a farm located

15 in Waycross, Georgia?

16 A.   Yes.

17 Q.   And did he contract with other farmers to help find and

18 recruit foreign workers to enter the United States under the

19 H-2A visa program?

20 A.   Yes.

21 Q.   Were one of those farms Codefendant Mr. Stanley Neal

22 McGauley?

23 A.   Yes.

24 Q.   And was Mr. McGauley, was he the owner of Hilltop Packing,

25 a farm and packing plant also located in Waycross, Georgia?

1   A.    Yes.

2   Q.    Was Mr. King, the defendant, also the registered agent of

3   Codefendant Mr. McGauley's business, Hilltop Packing, LLC?

4   A.    Yes.

5   Q.    Using an agent related to a codefendant Maria Patricio,

6   did the defendant Mr. King file a petition ending in 1049 for

7   Kings Berry Farm?

8   A.    Yes.

9   Q.    And did that petition, did Mr. King sign that petition

10  under penalty of perjury?

11  A.    Yes.

12  Q.    Certifying that everything in there was true and correct?

13  A.    Yes.

14  Q.    And the petition that ended in 1049, was that mailed from

15  Douglas, Georgia to the United States Citizenship and

16  Immigration Services at the California Service Center on or

17  about August the 8th of 2018?

18  A.    Yes.

19  Q.    Did this petition request 300 H-2A workers for employment

20  for a period of time to harvest blueberries and tomatoes in

21  Waycross, Georgia?

22  A.    Yes.

23  Q.    All for Kings Berry Farm?

24  A.    Yes.

25  Q.    According to the terms of this petition, were the workers

1  required to stay in the Comfortel Suites in Douglas, Georgia?

2  A.    Yes.

3  Q.    And work there at the locations associated with the Kings

4  Berry Farm?

5  A.    Yes.

6  Q.    Now on October the 23rd of 2018, did officers with the US

7  Citizenship and Immigration Services conduct a site visit at the

8  location where the workers were supposed to be living and

9  supposed to be working that were associated with this petition?

10 A.    Yes.

11 Q.    Did the officers speak with the owner and manager of the

12 Comfortel Suite?

13 A.    Yes.

14 Q.    And that's where the workers were supposed to be staying

15 on this petition?

16 A.    Yes.

17 Q.    And did the owner explain that he did not have any

18 contracts with any farm at that time?

19 A.    Yes.

20 Q.    And did he say that he could not remember speaking with

21 anybody at Kings Berry Farm, could not remember how they

22 contacted him, if they even contacted him or why he would have

23 contracted with that farm?

24 A.    Yes.

25 Q.    Did the officers ask the owner of the hotel if any workers

1  ever showed up and did he reply they never showed up or rented

2  rooms?

3  A.    Yes.

4  Q.    During the site visits, did officers also go to speak with

5  Mr. King at Kings Berry Farm?

6  A.    Yes.

7  Q.    The location where the workers were supposed to be

8  working?

9  A.    Yes.

10 Q.    And at that time, did they have -- did the officers speak

11 with the defendant, Mr. King?

12 A.    Yes.

13 Q.    Did Mr. King explain that he requested approximately 150

14 workers for that round of crops and that he was expecting an

15 additional 150 in May or April in 2019?

16 A.    Yes.

17 Q.    Did he indicate that about 80 showed up and he had

18 documentation for about a hundred, and the rest, there were

19 about 28 that he thought had absconded?

20 A.    Yes.

21 Q.    Did at the explain that he told his crew leader, who was

22 Javier Sanchez Mendoza, about the absconders but did not tell

23 the federal government?

24 A.    Yes.

25 Q.    Did he further explain that he only needed 80 workers for

1 blueberries and 70 workers for tomatoes for his crops?

2 A.    Yes.

3 Q.    Although he only needed 150 workers, did Mr. King indicate

4 that he requested 300 workers at the request of the crew leader,

5 Javier Sanchez Mendoza?

6 A.    Yes.

7 Q.    And during the site visit, did officers with the U. S.

8 Citizenship and Immigration Service confirm that the United

9 States records showed that only 91 workers entered on that --

10 that 91 workers entered on that petition but none of those 91

11 workers were present during that site visit?

12 A.    Yes.

13 Q.    Did Mr. King also talk about how much the workers were

14 supposed to be getting paid?

15 A.    Yes.

16 Q.    Did he explain that he was unaware exactly how much they

17 were actually getting paid but that he was paying Javier

18 Sanchez?

19 A.    Yes.

20 Q.    Did he explain that he, that he probably paid, that Javier

21 probably pays the workers less than what Mr. King was paying

22 Javier Sanchez?

23 A.    Yes.

24 Q.    And according to the petition, were the workers supposed

25 to be getting paid $10.95 per hour?

1   A.    Yes.

2   Q.    And did a review of Mr. King's bank records reveal that

3   they were not paying Javier Sanchez $10.95 per worker?

4   A.    Yes.

5   Q.    So during the second visit, were the officers able to

6   confirm the petition ending in 1049 that Mr. King signed under

7   penalty of perjury that they only used a portion of the

8   requested workers?

9   A.    Yes.

10  Q.    And that the workers were not staying at the approved

11  location?

12  A.    Yes.

13  Q.    And they were not at the approved work locations?

14  A.    Yes.

15  Q.    Did law enforcement identify a victim identified as Victim

16  12 who entered under petition ending in 1049?

17  A.    Yes.

18  Q.    Did law enforcement interview Victim 12?

19  A.    Yes.

20  Q.    Did she explain that he was raped by Javier Sanchez and

21  beaten by him?

22  A.    Yes.

23  Q.    And kidnapped at knifepoint at one point?

24  A.    Yes.

25  Q.    Did she explain that she was not paid under the terms of

1   the contract?

2   A.    Yes.

3   Q.    Did he also explain that she overheard conversations

4   between Javier Sanchez Mendoza and the defendant, Mr. King,

5   about the relationship?

6   A.    Yes.

7   Q.    And did she explain that the defendant, Mr. King, and his

8   codefendant business partner Mr. Stanley McGauley as well Javier

9   Sanchez Mendoza were all involved in a plan to augment workers

10  on the petition?

11  A.    Yes.

12  Q.    Basically pad the petition for extra workers?

13  A.    Yes.

14  Q.    Did she explain that this was done all to make money?

15  A.    Yes.

16  Q.    Did law enforcement have a chance to interview Javier

17  Sanchez Mendoza?

18  A.    Yes.

19  Q.    Did he confirm that he and Mr. King and Mr. McGauley would

20  request additional workers than necessary to make money off this

21  scheme?

22  A.    Yes.

23  Q.    Did he explain that he or other coconspirators located in

24  Mexico and other countries would charge the workers a fee to

25  come over to the United States?

1   A.    Yes.

2   Q.    And that, did he explain that the more workers they

3   brought, the more money they made?

4   A.    Yes.

5   Q.    And so did an entire review of the petitions, the

6   immigration documents, witness interview and coconspirator

7   statements as well as bank records show that the defendant Mr.

8   King signed a false petition for H-2A workers?

9   A.    Yes.

10  Q.    Did it show that he caused false petitions to be mailed to

11  the federal government?

12  A.    Yes.

13  Q.    And that there were missing H-2A workers on petition done

14  by Mr. King?

15  A.    Yes.

16  Q.    And that workers were exploited who entered under Mr.

17  King's petition?

18  A.    Yes.

19  Q.    And that Mr. King knew about the scheme to mail false

20  petitions to bring in extra workers to make money?

21  A.    Yes.

22  Q.    And that Mr. King, in fact, made money under this scheme?

23  A.    Yes.

24        MS. GROOVER:  Those are all the questions I have, Your

25  Honor.

1    THE COURT:  Mr. Downie, any questions for the special

2  agent?

3    MR. DOWNIE:  No, Your Honor.

4    THE COURT:  You may step down.  Thank you.

5    Mr. Downie, Mr. King, reapproach.

6    Mr. King, do you dispute any of the testimony given by

7  the special agent in your case this morning?

8    THE DEFENDANT:  No, Your Honor.

9    THE COURT:  Do you admit the truth of his testimony?

10    THE DEFENDANT:  Yes, Your Honor.

11    THE COURT:  Based on the record made at this proceeding,

12  I'm satisfied there's a factual basis for a plea of guilty to

13  Count 1.  Let it be entered.

14    THE CLERK:  The plea of guilty has been entered, Your

15  Honor.

16    THE COURT:  The plea of guilty is accepted and I now

17  adjudge you guilty of Count 1.  The probation officer will

18  conduct a presentence investigation.  She will issue a report

19  and disclose that report to the Defense and to the Government

20  and will thereafter schedule your sentencing hearing.

21    Let me hear from all concerned regarding Mr. King going

22  forward beginning with probation.

23    PROBATION OFFICER RENFROE:  Your Honor, Mr. King has

24  been on bond since November 23rd of 2021.  He's not committed

25  any violations.  Based on his conduct, the probation office

1    would recommend that he be allowed to remain on bond.

2         THE COURT:  Ms. Groover, on behalf of the United States.

3         MS. GROOVER:  United States agrees that Mr. King should

4    remain on bond, Your Honor.

5         THE COURT:  And Mr. Downie, I assume that would be your

6    request.

7         MR. DOWNIE:  You would assume correctly, Your Honor.

8         THE COURT:  Mr. King, just to be clear, what we're

9    talking about is what happens to you right now.  What happens to

10   many people right now is I remand them immediately to the US

11   Marshal, but because you've complied with all the conditions of

12   your bond, I'm going to allow you to remain on that bond pending

13   sentencing.

14        It may go without saying but it's so important that I

15   need to tell you that the worst thing you could do at this point

16   would be to violate one of those conditions of bond.

17        It would result not only in me having the marshals come

18   and get you immediately but you would stand to lose the very

19   benefit of having entered a timely plea; understand?

20        THE DEFENDANT:  Yes, Your Honor.

21        THE COURT:  With that understanding, then we will

22   continue the conditions of bond, and, Mr. Downie, you may be

23   excused.

24        MR. DOWNIE:  Thank you, Your Honor.

25        (Proceeding concluded at 10:55 a.m.)

1  CERTIFICATION

2

3      I certify that the foregoing is a true and correct

4  transcript of the stenographic record of the above-mentioned

5  matter.

6

7

9  _____     11/28/2023

10  Debra Gilbert, Court Reporter        Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25